IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-CV-1746-MSK

TOWN OF SUPERIOR,

    Plaintiff,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
GREG SHEEHAN, in his official capacity as
    Acting Director of the Fish and Wildlife Service, and
DAVID LUCAS, in his official capacity as Project Leader and Refuge Manager,
    Region 6 of the Fish and Wildlife Service,

    Defendants.

---

**OPINION AND ORDER ON MOTION TO REMAND AND/OR
SUPPLEMENT THE ADMINISTRATIVE RECORD, AND TO CONDUCT DISCOVERY**

---

**THIS MATTER** comes before the Court on the Plaintiff's Motion to Remand and/or Supplement the Administrative Record, and to Conduct Discovery (**# 17**), the Defendants' response (**# 26**), the Plaintiff's reply (**# 28**). Several additional motions are also pending (**# 22, 23, 25**).

**I.    BACKGROUND**

The area known as "Rocky Flats," located northwest of Denver, Colorado, was previously the location of manufacturing facilities for the production of nuclear weapons. Decommissioned in or about 1992, the site was notorious for its environmental hazards, including plutonium residue and other contaminants left over from manufacturing operations. Intensive cleanup efforts occurred, and in or about 2007, a roughly 4,000-acre parcel was transferred to the management of the United States Fish and Wildlife Services ("FWS"), where it

1

became the Rocky Flats National Wildlife Refuge ("the Refuge").

In or about 2005, the FWS began drafting a conservation plan and environmental impact statement (the "CP/EIS") to address how the Refuge would be managed and made available for public use. The CP/EIS that was ultimately approved included authorization for creation of roughly 15 miles of bicycle and pedestrian trails within the boundaries of the Refuge. As the Court understands, and as discussed below, it does not appear that these trails were actually constructed. The drafting, approval, and implementation of the 2005 CP/EIS is not at issue in this action.

The FWS decision at issue in this lawsuit was proposed in or about 2018. The record is not completely clear on exactly what constituted the FWS' 2018 proposal, but as the Court understands it, FWS was proposing to actually build some portion of the trail network previously authorized by the 2005 CP/EIS. The trails in question would largely be created by converting existing roads within the Refuge to dedicated bicycle/pedestrian trails, although there would be some modification or re-routing of existing trails as well.

The centerpiece of the proposal was the construction of an 8-mile long trail, from a point inside the eastern boundary of the Refuge near Indiana Street, passing along the south and west sides of the Refuge before terminating at the northern boundary of the Refuge near Colorado Highway 128. The proposal identified this trail as the "Rocky Mountain Greenway" (see below). It also identified two locations at the ends of the Greenway trail as "proposed trail connections" to other pedestrian and bicycle trail networks outside the Refuge, but with the express indication that approval and construction of those connections were deferred to future planning and were "not included in this determination".[1] Because the FWS concluded that the

---

[1] The proposal also identifies a site for construction of a contemplated "multi-purpose building"

2

proposed 2018 actions were minor, uncontroversial, and consistent with the 2005 CP/EIS, the FWS concluded that it was not required to conduct a new environmental assessment before approving the project. Instead, in March 2018, it issued a final notice ("the 2018 EAS") that simply approved the project on the basis of the environmental assessment in the existing 2005 CP/EIS.

The Plaintiff here, the Town of Superior ("Superior") contends that the proposed action is neither minor, noncontroversial, nor consistent with the 2005 CP/EIS. As Superior explains, the designation of the 8-mile trail segment as the Rocky Mountain Greenway is a substantial step towards a plan that will have the ultimate consequence of significantly increasing the number of visitors to the Refuge, eventually causing it to exceed the conservative assumptions and expectations about public use that supported the decisions made in the 2005 CP/EIS. The Rocky Mountain Greenway (hereafter, "the Greenway") is a project planned by a consortium of federal, state, and local entities, envisioning a large system of bicycle and pedestrian trails connecting major parcels of open space around the Denver metropolitan area and beyond, providing enhanced transit routes for recreational and commuter use. The Greenway project contemplates that the Refuge would become one of the "anchor points" of this trail network, and would significantly increase the number of visitors traveling to and through the Refuge. Superior and other community members who believe that the soil at the Refuge still contains substantial amounts of unremediated environmental contaminants are concerned that increased use of the Refuge caused by the Greenway project will lead to greater disruption of contaminated soils, both as a direct result of authorized and unauthorized visitor use itself and indirectly, by

---

near the contemplated trail connection at the northern edge of the Refuge. Like the trail connections, the contemplated multi-purpose building is expressly noted as falling outside the scope of the current action proposed by the FWS.

3

virtue of the FWS' eventual need to construct additional infrastructure (such as visitors centers, bathrooms, and roads and parking areas) to support increased visitor numbers.

Superior commenced this action asserting three claims for relief, all touching on FWS' alleged noncompliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*: (1) that FWS' 2018 EAS constitutes "impermissible segmenting" — that is, the future construction of additional trails, connections to other portions of the Greenway project, and other development are all foreseeable actions connected to the FWS' designation of the 8-mile trail as being part of the Greenway, such that the FWS should be required at this time to assess the environmental impacts under NEPA for the *entirety* of the Greenway project, not just the environmental impacts relating solely to the proposed action; (2) that FWS' conclusion that no further NEPA analysis was necessary because the 2018 proposal constituted only minor and uncontroversial changes to the uses contemplated by the 2004 EIS was erroneous, and that a full environmental assessment is necessary; and (3) that FWS' decision to approve the 2018 proposal without conducting an environmental assessment violates NEPA.

Presently pending are several motions that must be resolved before the Court can ultimately turn to the merits of this action. Most significantly, Superior moves (**# 17**) to supplement the administrative record (**# 15**) to include certain documents, as discussed more fully below. Superior's motion also requests leave to conduct "limited discovery" relating to some of these supplementary materials. Also pending are several motions (**## 22, 23, 25**) that seek to adjust briefing and other deadlines in this action due to the pending motion to supplement and other intervening events. Because the parties have now completed their merits briefing, the Court denies these latter motions as moot, leaving only the motion to supplement the record for resolution.

4

## II.     LEGAL STANDARD

Typically, an "agency's action is entitled to a presumption of validity, and the burden is upon the petitioner to establish the action is arbitrary or capricious." *Sorenson Commc'ns Inc. v. FCC*, 567 F.3d 1215, 1221 (10th Cir. 2009). Once agency action is challenged, a district court reviews the action as if it were an appellate court, applying the Administrative Procedure Act. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). The Court can set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Sitting in judicial review of the agency, this Court generally lacks the authority to conduct de novo proceedings and is confined to the administrative record. *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir. 1991). "The complete administrative record consists of all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993).

Circumstances warranting "consideration of extra-record materials are extremely limited." *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001). The Tenth Circuit explained in *Franklin Savings* that such circumstances could include "where the administrative record fails to disclose the factors considered by the agency"; for the purpose of "determining whether the agency considered all relevant factors including evidence contrary to the agency's position"; or in order to "explain technical terms or complex subject matter." 934 F.2d at 1137. The court of appeals has previously listed other possible justifications for expanding the record: (1) the agency action is inadequately explained and cannot be reviewed properly without further materials, (2) the record is deficient because the agency ignored relevant

factors it should have considered, (3) the agency considered factors left out of the record, (4) the case is so complex that more evidence is necessary to understand the issues, and (5) new evidence demonstrates the validity of the agency action. *See Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985).

## III. DISCUSSION

Superior asks the Court to remand this action to the Service to add information to the administrative record or, in the alternative, to allow Superior to supplement. (The Court summarily rejects the request for a remand.) Superior's motion proposes that the record be supplemented to include 23 separate exhibits, which are grouped into four major categories. The Court discusses each category in turn.

### A. Exhibits 1 through 5

Superior proposes to supplement the record with certain documents relating to applications that members of the Greenway project consortium have made to obtain funding for development of the Greenway project, both inside and outside the Refuge.

Exhibit 1 is a "Final Project Delivery Plan," dated November 2017, apparently prepared by a contractor on behalf of the Federal Highway Administration. It discusses a project to "construct a portion of the Rocky Mountain Greenway within the [Refuge]" and discusses "a fiscally-constrained configuration," "the desired configuration," and an option involving "East Woman Creek Loop to further connectivity within the Refuge."

Exhibit 2 is another document entitled "Initial Scoping Summary". Its author appears to be James Herlyck, a Project Manager with the U.S. Department of Transportation's Central Federal Lands Highway Division ("CFLHD") and it reflects "my team['s] costs and conclusions" regarding "the construction of two grade separated trail crossings to extend the Rocky Mountain

6

Greenway through [the Refuge] from where the trail current terminates in the Broomfield open space." The document notes that "new trail will be constructed within [the Refuge] to connect the two grade separated crossings." Among the recipients of Mr. Herlyk's cover email attaching Exhibit 2 are FWS officials.

Exhibit 3 appears to be an undated application, submitted by Jefferson County to the Colorado Federal Lands Access Program, seeking funding for the construction of the two trail connectors at the points where the trail inside the Refuge reaches the Refuge's boundaries and connects to other trail networks. Attached to the application are an array of documents, mostly reflecting various members of the Greenway consortium expressing their support for the application and Greenway project, including a May 2016 letter from David Lucas, the FWS official in charge of managing the Refuge. Mr. Lucas' letter notes that the proposal for construction of the trail connectors "will provide a new opportunity for non-motorized access and allow thousands of visitors to experience these untrammeled drainages [in the Refuge] and the wildlife they support."

Exhibit 4 is an April 15, 2016, "Planning memo," apparently authored by Elijah Henley, an official with the Department of Transportation. It appears to be "an official project update" about the Greenway project, the reasons why it was decided to route the Greenway through the Refuge rather than around it, and the FWS' agreement to conduct additional soil sampling to allay community members' fears of environmental contamination, among other things. Attached to that exhibit is a lengthy email string of various federal and local officials giving comments and editorial suggestions about the memo's contents, including comments from Mr. Lucas at the FWS.

Exhibit 5 is a March 8, 2017, letter from the CFLHD to Jefferson County, advising it that

7

its application for grant funding had been approved. Copied as one of the additional recipients of that letter is Mr. Lucas, as well as another FWS official.

Superior argues that these documents should be included in the administrative record because the FWS "aligned the Greenway Trail consistent with the route developed" by the consortium as part of its application for grant funding. "This is only possible," Superior argues, "if the [] planning documents were directly or indirectly considered by FWS when issuing the 2018 [proposal]." The FWS argues in response that, at most, the documents reflect that the members of the Greenway consortium were "influenced by the location of the trails as determined [by FWS], not the other way around."

This Court is satisfied that Exhibit 1 should be included in the administrative record. It reflects (albeit perhaps as hearsay) aspects of the FWS' decisionmaking process in choosing between various options for the routing of the 8-mile trail within the Refuge.[2] The Court also finds that Exhibit 3 is properly included in the record, at least for the limited purpose of reflecting Mr. Lucas' understanding as of May 2016 that incorporation of the Refuge into the Greenway project might result in "thousands of" additional visitors to the Refuge, as the presence of those visitors could constitute an environmental effect warranting consideration. Likewise, Exhibit 4 — in particular, Mr. Lucas' comments — disclose some degree of the FWS' reasoning regarding certain components of the 2018 proposal, such as "why is the [Greenway] route adjusted?" and "why the [Greenway] crosses Indiana [Street] where it does." The Court rejects the contention that Exhibits 2 and 5 are appropriately included in the record. Those documents certainly *reference* decisions made by the FWS about the siting of trails within the

---

[2] The Court, having not yet conducted its review of the record relating to the merits of this dispute, expresses no opinion as to whether the type of information found in Exhibits 1, 3, and 4 might be duplicated elsewhere in the record.

Refuge incident to the 2018 proposal, but the Court cannot conclude that those documents shed any light on the FWS' decisionmaking process.

**B.     Exhibits 6 through 10**

These exhibits are documents generated during FWS' implementation of its "engagement strategy," soliciting public comments and support in advance of formally proposing the 2018 changes.

Exhibit 6 is a December 7, 2015, memo from the FWS' Refuge Manager (possibly Mr. Lucas) to other officials at the National Wildlife Refuge System. It explains that the FWS' goal is to "use existing decisional documents" — *i.e.*, the 2005 CP/EIS — to create "an engagement strategy [that] will support planning for new visitor facilities, trails, and the necessary infrastructure for a full public opening [of the Refuge] in 2017." It emphasized the objectives of creating public perceptions of FWS as "a good neighbor" and as experts on the safe and appropriate use of Refuge lands and discussed certain ways in which it would conduct that outreach.

Exhibit 7 is the Refuge's Public Engagement Strategy, dated September 2016. It discusses the history of the Refuge project, the Refuge's goal of implementing the decisions in the 2005 CP/EIS, and contains talking points and "key messages" that Refuge officials wished to communicate and emphasize to community members about the development and use of the Refuge, as well as schedules for community meetings.

Exhibit 8 is entitled "Rocky Flats Media Tour Anticipated Q & A" and appears to be a set of answers that FWS intended to give to specific questions — "when was it decided to open the refuge for public use and who authorized it?"; "how do you intend to address [Rocky Flats' controversial history] during the refuge's opening and beyond?" — that might be asked by media

representatives in the lead up to the Refuge opening to the public.

Exhibit 9 is a collection of written comments submitted to FWS during and after community meetings in 2017. The comments generally concern (and reflect opposition to) FWS' decision to open the Refuge to the public and to construct public trails within it.

Finally, Exhibit 10 consists of exchanges between Refuge officials and its public relations contractor, discussing plans for conducting community outreach meetings in 2017, discussing and refining talking points, and addressing various other matters.

Superior argues that these documents should be included in the record because they "cover a range of topics including the Superfund/CERCLA response at the refuge, public safety, and the Greenway-Refuge connection." The FWS responds that most documents relating to public engagement predate the planning and implementation of the 2018 proposal, and do not necessarily bear upon the specific decisionmaking process regarding that proposal. The FWS also objects to the inclusion of the written public comments because those comments "are almost exclusively about the opening of the Refuge in general, not the specific location of trails which is the subject of the 2018 [proposal]."

The Court agrees with the FWS that most of these exhibits should not be included in the record. The Refuge's strategies for winning community support and its various talking points are not probative of its decisionmaking strategy with regard to the 2018 proposal, but instead its decisionmaking with regard to public access to the Refuge. As noted, opening the Refuge to public use via recreation trails was a matter considered as part of the 2005 CP/EIS and is not subject to reconsideration here. Thus, subjects of discussions with the public about the wisdom of opening the Refuge to public use are not germane to the narrower question here of whether the siting of particular trails and, if appropriate, the connection of those trails to other parts of the

Greenway project. However, the Court agrees with Superior that Exhibit 9, the written public comments, are appropriately included in the record. Some of those comments (most notably a December 6, 2016 letter from the University of Denver's Environmental Law Clinic, and a May 22, 2017, letter from Timothy Gablehouse) specifically comment on differences between the trails contemplated in the 2005 CP/EIS and the trails proposed as part of the Greenway project (suggesting that the 2005 CP/EIS might not suffice to authorize construction of Greenway trails). Because the FWS relied entirely on the 2005 CP/EIS in deciding to approve the 2018 proposal, evidence and information suggesting differences between the two plans were an appropriate subject for the FWS to consider and are relevant to the instant dispute. Thus, the Court finds that it is appropriate to include Exhibit 9 in the record.

C. **Exhibits 11 through 20**

Superior proposes to add Exhibits 11 through 20 to the administrative record because they reflect requests that the FWS conduct additional soil testing in the Refuge.

Exhibit 11 is a May 2016 letter to FWS from the Boulder Counter Board of County Commissioners. It notes that the Commissioners are "considering potential trail connections from our [lands] into the Refuge," and states that they would "like assurances that residual contamination of the Refuge is below" a certain standard. It requests that the FWS "conduct soil sampling for the presence of any radionuclides on all sites within the Refuge where construction will occur," including on trails. The letter also notes that historical soil sampling shows elevated contamination levels near the proposed connection of the trail to Indiana Street and requests that FWS "review the currently proposed trail alignment and consider options for mitigating the risk of exposure to visitors by rerouting the trail," suggests that FWS consider "the type of trail surface that is used throughout the Refuge" to reduce soil disturbance from erosion,

11

and that FWS "strictly enforce the requirement that users stay on designated trails."

Exhibit 12 is a January 18, 2018, letter from the City of Broomfield to the City of Westminster — FWS is copied as a recipient — requesting that the two municipalities jointly request that FWS align the entrance to the path within the Refuge to a certain point on Indiana Street, consistent with the 2005 CP/EIS, so as to avoid an area of higher contamination and to avoid crossing a particular creek.   (The letter makes only a passing reference to soil sampling.)

Exhibit 13 is a July 28, 2017, letter from the FWS to the Director of the City of Broomfield's Open Space department.   In that letter, FWS expresses that it continues to support ongoing soil sampling within construction areas of the Refuge, as well as for areas where grant-funded trail connectors to external trail networks will be located.

Exhibits 14 though 18 appear to be related.   Exhibit 14 is an October 2017 Request for Proposal issued by Jefferson County, seeking bids for contractors to conduct soil sampling "around the crossing locations" where the Greenway trail enters or exits the Refuge.   Exhibit 15 is a March 2018 e-mail exchange between Mr. Lucas, on behalf of FWS, and an individual named Jason Andrew, who was apparently retained by Jefferson County to perform soil sampling.   Mr. Lucas requests that he and Mr. Andrew discuss FWS retaining Mr. Andrew to conduct additional soil testing at certain locations within the Refuge itself.   Exhibit 16 is a June 2018 Statement of Work discussing the performance requirements attendant to Mr. Andrew's sampling of soil at the Refuge.   Exhibits 17 and 18 are the sampling plan that Mr. Andrews' firm developed.

Exhibit 19 is an August 2018 memo from Jefferson County to other members of the Greenway consortium, explaining that "several members of the public have sent emails to local elected leaders . . . which contain numerous factual errors and confusion of local vs. federal

processes" with regard to the Greenway project. The memo recites some of the errors and Jefferson County's response. Notably, the memo indicates that FWS has agreed to undertake a NEPA analysis relating to the construction of any trail connectors to external trail networks.

Finally, Exhibit 20 consists of a series of documents, mostly dating to 2016, from various municipalities and members of the Greenway consortium, expressing their support for the Greenway project. (These appear to be many of the same documents, including Mr. Lucas' letter, that are included in Exhibit 3).

Superior argues that these documents should be included in the record because they "demonstrate FWS ignored relevant factors when issuing the 2018 EAS," as "soil samplng is a major factor related to routing the Greenway Trail through the Refuge." In response, FWS contends that some of the exhibits in question are post-decisional (and therefore irrelevant to the instant appeal), and that others relate solely to soil sampling concerning the trail connectors that are not part of the 2018 proposal.

Of these exhibits, the Court finds that only Exhibits 11 and 12 are properly included in the record. They specifically comment on the construction and orientation of any proposed trail, and thus are germane to FWS' decision making process with regard to the 2018 proposal for siting and construction of the Greenway trail. The Court agrees with FWS that the remaining documents are either post-decisional, refer specifically to soil sampling relating to trail connectors that are not part of the 2018 proposal, or are otherwise duplicative of documents and information already in the record.

**D.   Exhibits 21 through 23**

Finally, Superior seeks to add documents "regarding controversy" over the project, to establish that, contrary to FWS' finding in the 2018 EAS, the project was indeed "controversial"

13

and therefore warranted a more detailed environmental assessment.

Exhibit 21 is a May 31, 2018 article from the Boulder *Daily Camera*, entitled "Top Jeffco Health Official Casts Doubt on Safety of Opening Rocky Flats Refuge." It refers to several individuals who filed affidavits in another lawsuit against FWS concerning public access to the Refuge, in which those individuals expressed doubt that the Refuge could safely be used for public recreation.

Exhibit 22 is an agenda from a December 2017 meeting of the Board of Education of the Adams 12 Five Star School District. It notes and joins in an October 2017 resolution by the Board of Education of Adams County School District 14 that prohibits public school trips to the Refuge because of health and contamination concerns.

Exhibit 23 is a February 2018 e-mail exchange between Mr. Lucas and members of the Colorado Department of Public Health and Environment ("CDPHE") discussing a February 5, 2018 press release put out by Harvey Nichols, a biology professor, challenging CDPHE's conclusions that "there are not health implications from operations at Rocky Flats." The exhibit also contains a September 2018 letter from Congressman Jared Polis to Ryan Zinke, Secretary of the Interior, asking that the Department conduct further soil testing at the Refuge to determine whether a 2013 flood may have affected contamination levels.

The Court rejects these exhibits as either post-decisional or because nothing indicates that they were considered by the FWS as part of its decisionmaking. The fact they purport to establish — that community members had raised concerns about health implications arising from recreational use of the Refuge — is already evident in the record in other forms.

E.  **Additional Discovery**

Superior requests that it be permitted to undertake "limited discovery on these issues,"

14

but it is not clear to the Court what "these issues" are or what discovery Superior proposes. It appears that Superior is arguing that because FWS excluded some pertinent documents from the record, Superior should be allowed to conduct discovery from FWS to determine whether there are even more relevant documents being omitted. The Court finds Superior's request to be too speculative to warrant relief. Accordingly, the request to engage in discovery is denied.

## IV. CONCLUSION

For the foregoing reasons, Superior's Motion to Supplement (**# 17**) is **GRANTED IN PART** and **DENIED IN PART**. The Court grants the motion insofar as it deems Exhibits 1, 3, 4, 9, 11, and 12 to Superior's motion to be included within the administrative record, but denies the request to supplement the record with any other documents and denies Superior's request to engage in discovery. The Joint Motion to Amend (**# 22**), the Motion to Stay (**# 23**), and the Joint Motion for Extension of Time (**# 25**) are **DENIED AS MOOT**.

Because the matter has already been fully briefed on the merits, the Court will provide each side 21 days within which to simultaneously file a supplemental brief addressing only those arguments that arise specifically based on the supplementation of the administrative record as set forth herein. Counsel are encouraged to be succinct and focused; repetition of arguments already presented or arguments that are not specifically tied to the supplemental materials accepted herein will be disregarded.

Dated this 19th day of September, 2019.

**BY THE COURT:**

_Marcia S. Krieger_
Marcia S. Krieger
Senior United States District Judge