IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-1746-MSK

TOWN OF SUPERIOR,

    Plaintiff,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
GREG SHEEHAN, in his official capacity as
Acting Director of the Fish and Wildlife Service, and
DAVID LUCAS, in his official capacity as Project Leader and Refuge Manager,
Region 6 of the Fish and Wildlife Service,

    Defendants.

## OPINION AND ORDER ON THE MERITS

**THIS MATTER** comes before the Court for resolution on the merits. The Court has considered the administrative record **(# 15**, as supplemented **# 31)**, and the parties' briefing **(#24, 27, 32)** and submissions of supplemental authority **(# 30, 33)**.

## BACKGROUND FACTS

From the 1950s to the early 1990s, the Rocky Flats Plant, located in Jefferson County, Colorado, was a facility that manufactured components for nuclear weapons. When operations ceased, extensive environmental contamination of the production facility and surrounding lands with plutonium, heavy metals, and other toxins led to its designation as a federal Superfund site. Cleanup and remediation efforts continued through roughly 2007, when federal and state

1

authorities concluded that a 5,000 acre parcel[1] was suitable for public access. The designated parcel was transferred to the U.S. Department of the Interior's Fish and Wildlife Service ("FWS") to be maintained and operated as the Rocky Flats National Wildlife Refuge ("the Refuge").

In 2005, FWS adopted a Comprehensive Conservation Plan ("the 2005 Plan") detailing its intended future uses for the Refuge. FWS considered a range of alternatives, from no public access to the Refuge to uses focusing on public access and recreation. Ultimately, FWS decided to allow for a moderate degree of wildlife-focused public use. FWS' chosen alternative anticipated the construction of "12.8 miles of multi-use trail [open to pedestrian, equestrian, and bicycle use], 3.8 miles of hiking-only trail, a visitor contact station, interpretive overlooks, viewing blinds, and associated access and parking facilities." A Visitor Use Map, depicted below, shows the location and routing of the trails FWS intended to construct:

---

[1] The primary production area of the Rocky Flats Plant was a roughly 300-acre portion at the center of the parcel. It was the site of the most extensive environmental contamination and remains under the authority of the Department of Energy to this day. It is not accessible by the public and is not at issue in this case.



As reflected in the various notations shown with blue arrows around the perimeter of the Visitor Use Map, the 2005 Plan expressly contemplated that the trails within the Refuge would:

> tie into surrounding existing and proposed trial systems [through] additional trailheads [that] will be built on the north, east, and south boundaries of the Refuge. Strategically located to provide links to proposed trail networks, the secondary access points along the Refuge boundary will permit visitors to enter the site on foot, bike, and in some cases by horse. . . .
>
> Since visitors will be able to enter the site from a number of access points, each entry will serve as a "use portal" where signage will inform users about the distinction between where they came from (*e.g.* municipal open space) and where they are going (a National Wildlife Refuge).

Although the creation of trails through the Refuge were approved in 2005, more than a decade would pass before they were actually constructed.

Independently, in 2012, state and local officials began planning the Rocky Mountain Greenway Project ("the Greenway Project"), which envisioned "a continuous trail/transportation

connection between Rocky Mountain National Park [near Estes Park, Colorado] and the Rocky Mountain Arsenal [located northeast of Denver, Colorado]." The Greenway Project was intended to connect various existing and future public trails and open space networks to form an unbroken, long-distance pedestrian and bicycle trail corridor for recreational and commuting uses.

One concept for the Greenway Project included connecting the Refuge's own multi-use trails to other trail networks adjacent to the north (*i.e.* Boulder County Open Space) and east (City of Westminster Open Space) of the Refuge. In 2016, federal agencies approved funding for the Greenway Project to construct two grade-separated trail crossings at the north and east edges of the Refuge, connecting the Refuge's trails with the adjacent trail networks. The agencies approving federal funding for the construction of the crossings understood that "both the [ ] crossings and the trails within [the Refuge] will be designed and constructed as one project," and that any environmental studies that FWS would be required to conduct pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*, with regard to the construction of trails within the Refuge would also involve consideration of the environmental consequences of connecting those interior trails to the other parts of the Greenway Project.

As mentioned above, progress on constructing the trails and improvements contemplated by the 2005 Plan was slow. In 2014, FWS began conducting "public tours" of the Refuge, apparently guiding small groups of visitors through the Refuge using existing roadways. By 2018, FWS was intending to "begin steps to allow larger numbers of visitors" to engage in unguided recreational use of the Refuge. That step would require the trails contemplated by the 2005 Plan to be constructed. It does not appear that FWS felt that it was obligated to engage in additional environmental review under NEPA to simply begin constructing the trails;

4

presumably, the analysis in the 2005 Plan suffices for that purpose. (At the very least, no party presently asserts otherwise.) But in March 2018, FWS issued an Environmental Action Statement ("the Statement") that proposed "[making] minor adjustments to the management direction and strategies found in the [2005] Plan as necessary to better implement wildlife-dependent recreational opportunities" in the Refuge. That Statement is at the heart of this case.

The primary focus of the Statement was to identify certain "minor changes" to trail routings and other land use restrictions that the FWS intended for the Refuge. None of those changes are at issue here. Instead, the Plaintiff's concerns relate to certain matters that appear incidentally in the Statement or which are expressly designated as falling outside the scope of the Statement. Specifically:

> • The Statement included a map of the trails FWS intended to establish, as well as the names that FWS intended to give each trail. As pertinent here, the primary 8.3-mile trail through the Refuge, depicted by the green line, was given the name "Rocky Mountain Greenway" (hereafter, "Greenway Trail"):



• The map depicted two areas (shaded in pink) where the Greenway Trail might meet the northern and eastern boundaries of the Refuge. Those locations were annotated as being the location of "Proposed trail crossing[s]," but the map indicated that "Proposed trail connection[s are] not included in this determination," meaning that FWS was not intending for the Statement to make any findings regarding the environmental impacts that might arise from the construction of these connectors.

• The body of the Statement contained the following text: "Additional trail connections leading to adjacent municipal open space lands may be needed for trail connectivity. The locations of these proposed connections remain very similar to what was proposed in 2005. These two trail connections are proposed by adjacent local governments, may or may not occur in the future, and are not included with this determination thus requiring a future NEPA determination(s).

The Rocky Mountain Greenway [Project] has been granted additional external funding . . . If these projects proceed, they will improve the surface of the portion of this trail that crosses the refuge and includes improved trail connections to the Westminster Open Space to the east of the refuge and Boulder County Open

6

>Space to the north of the refuge. Initial scoping for these programs was conducted in the summer of 2017. Detailed planning would occur in 2018 and, if approved, construction would begin in 2019. These two trail connections are proposed by adjacent local governments, may or may not occur in the future, and are not included with this determination thus requiring a future NEPA determination(s)."

In other words, although it was once expected that FWS would simultaneously evaluate the environmental consequences of constructing the interior trails in the Refuge **and** the connectors that would join such trails to the larger Greenway Project, the Statement decoupled the two matters. The Statement concluded that construction of the trails themselves could proceed without further environmental analysis, as FWS determined that the minor modifications contemplated by the Statement were so insubstantial as to be subject to "categorical exclusion" from further NEPA analysis. Consideration of the environmental effects of joining the interior trails to the broader Greenway Project was deferred to some point in the future. (The record before the Court does not indicate when or if such consideration has occurred to date.)

## ISSUES

The Plaintiff ("the Town") commenced this action, bringing claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* The Town contends that FWS' adoption of the Statement was contrary to law in violation of 5 U.S.C. § 706(2)(A), because FWS did not adequately comply with NEPA in three respects: (i) FWS impermissibly "segmented" environmental review of the creation of interior trails in the Refuge from future review of the environmental impacts of connecting those internal trails to the Greenway Project, or put differently, FWS failed to consider the whole of the project; (ii) FWS' invocation of the "categorical exclusion" from NEPA analysis was improper because certain "extraordinary circumstances" prevent the use of the categorical exclusion in this case; and (iii) the decision to

route the Greenway Project through the Refuge would have significant environmental effects,[2] such that NEPA requires FWS to conduct an environmental assessment or environmental impact statement concerning the decision to do so.  Those claims are now before the Court for determination on the basis of the administrative record.

## ANALYSIS

### A. Statutory framework

#### 1. APA

The APA provides the mechanism by which courts review final agency decisions.  Under the APA, the Court may set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  A decision is arbitrary or capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency" or where the action "is so implausible that it could not be ascribed to a different in view or the product of agency expertise." *High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1222 (10th Cir. 2020).  A court must afford the agency's decisionmaking a presumption of validity and

---

[2] The crux of the Town's concerns of adverse environmental impacts resulting from including the Greenway Trail in the greater Greenway Project is that doing so would result in substantially larger numbers of trail users than the 2005 Plan anticipated.  The 2005 Plan anticipated up to about 85,000 annual visitors to the Refuge, yet Greenway Project organizers estimate as many as 200,000 annual users of that section of the project.  The Town further argues that persons using the trail as part of the Greenway Project, such as "hard-hitting mountain bikers" and commuters making frequent trips back and forth along the trail, are likely to engage in environmentally-disruptive uses of the trails.  The Town is concerned that increased recreational use of lands within the Refuge can increase the likelihood of still-contaminated/inadequately-remediated soil and dust becoming airborne and spreading to communities outside the Refuge, as well as potential adverse health consequences to visitors themselves.

the burden is on the party challenging it to demonstrate that the decision is arbitrary and capricious.  *Id.*

        2.  NEPA

NEPA requires federal agencies to analyze potentially significant environmental consequences before initiating actions that might affect the environment.  Typically, the agency is required conduct a thorough environmental review of the intended action and plausible alternatives before deciding to act, as well as solicit public participation and comment it its decisionmaking.  *See generally* 42 U.S.C. § 4332(2)(C).  However, certain types of decisions are subject to "categorical exclusions" from NEPA's requirements of environmental review.  40 C.F.R. § 1501.4(a) permits agencies to designate "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment . . . ."  If an agency determines that a particular action is subject to a categorical exclusion, it must nevertheless "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect."  40 C.F.R. § 1501.4(b).  If an extraordinary circumstance is present, the agency may nevertheless find that "there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects," and continue to categorically exclude the action; otherwise, the agency must engage in the necessary NEPA environmental review.  40 C.F.R. § 1501.4(b)(1), (2).

FWS has adopted regulations providing that "changes or amendments to an approved action" are categorically excluded from NEPA review "when such changes have no or minor potential environmental impact."  FWS Department Manual, Part 516, Chapter 8, Sec. 8.5(A)(1).  The Department of the Interior has promulgated a list of "extraordinary circumstances" that must be considered along with any categorical exclusion, including actions that "have highly

controversial environmental effects" and actions that "have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. § 46.215(c), (f).

Notably, NEPA describes only <u>procedural</u> requirements; so long as those requirements are followed, the Court does not concern itself with the wisdom of the agency's decisionmaking. *New Mexico ex. rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009). As the Supreme Court has stated, NEPA "prohibits uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). The touchstone of the Court's inquiry is whether the agency "took a hard look at information relevant to the decision," that is, whether the agency "did a careful job at fact gathering and otherwise supporting its position." *Richardson,*, 565 F.3d at 704.

### B. Segmentation

In large part, the Town's arguments in this case turn on the question of whether FWS' decision to decouple consideration of the environmental effects of construction of trails in the interior of the Refuge from consideration of the environmental effects of connecting those trails to the larger Greenway Project constituted improper "segmentation" of a single, common action. NEPA requires that an agency consider the environmental consequences of the contemplated action, as well as any "connected" actions. 40 C.F.R. § 1051.3(b). This requirement exists to "prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant impact, but which collectively have a substantial impact." *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1228 (10th Cir. 2008). Actions are "connected" where they: (i) automatically trigger other actions that may require environmental review; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are

interdependent parts of a larger action and depend on the larger action for their justification. 40 C.F.R. § 1501.9(e)(1)(i)-(iii).[3]  The 10th Circuit examines the existence of connected actions through the "independent utility" test, considering "whether each of the two projects would have taken place with or without the other and thus had independent utility."  *Wilderness Workshop*, 531 F.3d at 1229.  "When one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes."  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006), *cited with approval in Wilderness Workshop*, 531 F.3d at 1229.

There can be little doubt that the construction of multi-use trails within the Refuge has a utility independent from the existence of the Greenway Project itself.  As far back as 2005, long before the concept of the Greenway Project, FWS expressed an intention to promote public recreation and access to wildlife areas in the interior of the Refuge via the creation of multi-use trails in the northern, western, and southern sections.  A comparison of the 2005 Visitor Map and the 2018 Statement's map make clear that the Greenway Trail's layout is effectively identical to the concept of that trail back in 2005.   The Town argues here that "there is no demonstrable independent utility in having a standalone section of the Greenway Trail within the Refuge that will never be connected to off-Refuge segments," but the 2005 Plan unmistakably rebuts that contention.  Even if they are never connected to the broader Greenway Project, the trails in the Refuge would have utility to visitors to the Refuge to allow them to explore, sightsee, and enjoy the Refuge itself.[4]

---

[3]     Until a July 2020 restructuring, these regulations were instead found at 40 C.F.R. § 1508.25(a)(1).  *See* 85 Fed.Reg. 43304 (Jul. 16, 2020).

[4]     The Town's argument seems to spring largely from the fact that FWS decided to affix the name "Greenway" to the Greenway Trail.  Certainly, that naming decision is indicative of FWS'

If one analogizes the Greenway Trail to a vehicle road, the analysis used to determine whether highway-type projects have been improperly segmented is arguably applicable. When looking at a single segment of a larger transit project, courts define the scope of the necessary environmental review under NEPA by considering whether the proposed segment: (i) has logical termini, (ii) has substantial independent utility, (iii) does not foreclose the opportunity to consider alternatives, and (iv) does not irretrievably commit federal funds for closely-related projects. *See Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1183 (10th Cir. 2002). Here, the Greenway Trail itself has logical endpoints, stopping at the boundaries of the Refuge. As the 2005 Visitor Map makes clear, FWS intends to construct parking facilities at each end of the Greenway Trail, allowing Refuge visitors to access it from either end (in addition to accessing it from the visitor center). As noted above, the trail has a recreational and sightseeing utility to Refuge visitors independent of the Greenway Project. The completion of the Greenway Trail does not foreclose FWS' ability to later decide that linking the Greenway Trail to the Greenway Project is unwise – FWS can always refuse to allow any connectors to be built on its land or close gates or fence off each end of the trail, such that it is only accessible to visitors within the Refuge. And FWS' decision to construct the Greenway Trail does not operate to commit any federal funds for the Greenway Project, as it is undisputed that trail funding and Greenway Project funding come from different sources. Thus, it is reasonable for FWS to consider the construction of the Greenway Trail as an independent agency action without having

---

intention that, someday, the connectors contemplated by the Greenway Project would be completed and the Greenway Trail would become a section of the broader Greenway Project. But it would seem that if FWS had given the trail a non-descript name like the "Refuge Trail" or "Flats Trail" in the interim, much of the Town's argument that the trail lacks any independent utility would evaporate.

to also evaluate the environmental consequences that might result from linking that trial to the Greenway Project.

Cases such as *Great Basin* suggest that the fact that the Greenway Trail has a utility independent of the Greenway Project is itself enough to defeat a finding that the two projects are "connected," without needing to consider the separate utility of the Greenway Project. 456 F.3d at 969 (projects are not connected where "one of the projects might reasonably have been completed without the existence of the other"), *but see Sierra Club v. Bureau of Land Management*, 786 F.3d 1219, 1226 (9th Cir. 2015) (acknowledging cases in which only one project was examined, but suggesting that "we [ ] have extended our analysis to each project"). Thus, the Court need not even consider whether the anticipated construction of the infrastructure connecting the Greenway Trail to adjacent trail networks (thereby completing this portion of the Greenway Project) has its own independent utility. But if the Court were required to find that the connective infrastructure of the Greenway Project <u>also</u> had utility independent of FWS' construction of the Greenway Trail, the Court would find that standard had been met. The Greenway Project specifically contemplates a linkage between the Westminster Open Space trail system to the east of the Refuge and the Boulder Open Space trail system to the north. To complete that linkage, it will be necessary to facilitate crossings of Indiana Street and Highway 128, two busy thoroughfares. The existence of grade-separated bridges and underpasses to allow users to make those crossings safely has its own intrinsic value, even if a gate or fence then blocks those users from proceeding onto the Refuge's trails and forces them to instead travel along sidewalks or road shoulders or other non-Refuge trails to reach the other crossing.[5]

---

[5] *See e.g.* Administrative Record at 00424 (implying the possibility of constructing a trail along Indiana Street instead of through the Refuge, although acknowledging that steep grades might make such a routing difficult); and at 00422 (discussing the possible construction of the

Certainly, that would be a decidedly suboptimal routing for the Greenway Project, and it may be that Greenway Project organizers would route the trail differently if access to the Refuge were denied to them, such that the contemplated connectors might not be built as planned. But that is a determination that cannot be predicted by this Court on the strength of the instant record. It is enough for the Court to find that the proposed connector infrastructure has at least an arguable theoretical utility that will exist regardless of whether the Greenway Project is allowed to proceed through the Refuge or is required to skirt around it.

To be clear, the Court is not ignoring the fact that all of the evidence in the record clearly suggests that FWS does indeed intend to someday connect the Greenway Trail to the greater Greenway Project. And because FWS has not yet analyzed the environmental consequences of effectuating that connection, it will someday have to do so. The Town argues repeatedly that such future NEPA analysis will not "provide a holistic environmental review of the Greenway-Refuge connection," but the Court does not share the Town's pessimism. NEPA specifically requires FWS to consider effects that are "reasonably foreseeable" from the action being considered. 40 C.F.R. § 1508.1(g)(1). If it can reasonably be foreseen that connecting the Greenway Project to the Refuge's trails will result in a substantial increase in the number of users of Refuge trails or the manner in which the Refuge will be used, FWS will have to consider those effects as part of its NEPA review of the decision to construct the connectors. But the mere fact that FWS may expect to join its trails to the Greenway Project in the future does not suffice to make the Statement's minor re-aligning of the internal trails (much less the naming of the Greenway Trail) a "connected action" requiring a more extensive NPEA review.

---

Jefferson Parkway, and its included "10-foot wide, multi-use trail that extends along the Parkway and eventually connects to the US 36 Trail" as also warranting a contemplated Indiana Street crossing).

Accordingly, the Court finds that the creation of trails (and specifically the Greenway Trail) within the Refuge and the creation of infrastructure that could connect that trail to adjacent trails systems are not "connected actions" under NEPA, such that FWS was required to analyze the environmental consequences of both actions when deciding to construct the internal trail itself.

### C.  Controversy

A finding that the Statement's action stands on its own, rather than implicating issues associated with connection to the Greenway Project, largely hobbles the Town's remaining arguments directed at FWS' decision.  The Town argues that FWS' decision to approve the 2018 Statement via a categorical exclusion was improper because issues and environmental concerns surrounding the use of the Refuge are "highly controversial."  As noted above, sufficient controversy over environmental impacts can constitute an "extraordinary circumstance" that prevents an agency from finding that a given decision is categorically excluded from further NEPA analysis.

There can be no disagreement that some members of the various communities around the Refuge (and in the greater Denver metropolitan area, and indeed, nationwide) believe that cleanup efforts around the Refuge have been inadequate or ineffective.  There is evidence that some members of those communities believe that opening the Refuge to <u>any</u> use, much less substantial recreational use, raises health concerns for those using the Refuge and concerns that such users might cause even broader spreading of environmental contamination through various methods.  Crediting the reasonableness of these concerns and acknowledging a generalized "controversy" over the decision to permit recreational use of the Refuge as a whole, the Court finds that the Town's argument here is misplaced.

15

The "agency action" that is the focus of this lawsuit is <u>not</u> the controversial decision to open the Refuge to visitors, or even the decision to prioritize some degree of recreational use at the Refuge.[6] Those decisions were finalized via the 2005 Plan and are beyond the consideration of this Court now. The only agency action at issue here are the decisions embodied by the 2018 Statement -- namely minor adjustments of trail routings and other inconsequential actions. When the Court's focus is narrowed to just those issues, none appear to be the subject of meaningful controversy.[7] The Town has not pointed to any evidence in the record that indicates that a substantial slice of the public finds the decision to realign the Greenway Trail to follow FWS Road 401 instead of FWS Road 450, or the decision to extend that trail to access a historic mining area, or the decision to realign the Rock Creek Trail to minimize creek crossings are matters that are particularly objectionable or controversial. Thus, the Court cannot say that FWS erred in concluding that the decisions embodied in the 2018 Statement were not controversial, such that they could be categorically excluded from NEPA analysis.

### D. Minor changes

Finally, the Town argues that FWS' invocation of a categorical exclusion when adopting the 2018 Statement was improper because the changes effectuated by that Statement were not "minor." Once again, the Town's argument on this point presupposes that FWS' decision included "the decision to route the Greenway [Project] through the Refuge." If the Town were correct that the decisions made by the 2018 Statement included such a matter, the Court might

---

[6] Nor is it the decision to connect the Greenway Trail to the Greenway Project. On the record before the Court, that decision has yet to be made.

[7] The 2018 Statement also included decisions to <u>restrict</u> certain off-trail uses of certain portions of the Refuge, even though the 2005 Plan <u>permitted</u> those uses. Certainly, the Town does not object to that portion of FWS' decision.

agree that the potential environmental issues arising from such a decision were more than "minor." But for the reasons set forth above, the Court finds that the Statement did <u>not</u> include any decisions about connecting any of the Refuge's interior trails to the Greenway Project. That decision has yet to be made and the decisions actually contained in the 2018 Statement are indisputably minor and insignificant adjustments to the 2005 Plan. Accordingly, the Court cannot say that the FWS' reliance on a categorical exclusion from further NEPA analysis was improper.

## CONCLUSION

For the foregoing reasons, upon review of the administrative record **(# 15**, as supplemented **# 31)**, the Court finds that the FWS decisions in the 2018 Statement were not arbitrary or capricious nor contrary to law. The Clerk of the Court shall grant judgment to the Defendants on the Town's claims in this action and shall close this case.

Dated this 16th day of September, 2021.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Senior United States District Judge